74 A.3d 728

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## Garland Howe STILLWELL.

### Misc. Docket AG No. 17, Sept. Term, 2011.

Court of Appeals of Maryland.

Sept. 13, 2013.

Raymond A. Hein, Deputy Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for Petitioner.

Shea L. Hoxie, Esquire (Law Offices of Bruce A. Johnson, Jr., LLC), Bowie, MD, for Respondent.

Argued before BARBERA, C.J., BATTAGLIA, GREENE, ADKINS, McDONALD, BELL* and CATHELL , DALE R. (Retired, Specially Assigned), JJ.

BELL, C.J.

The Attorney Grievance Commission, pursuant to Maryland Rule 16–751 [1] and acting through Bar Counsel, filed, in this Court, a petition for disciplinary or remedial action against the respondent, Garland H. Stillwell. In the petition, it alleged that the respondent violated certain of the Maryland Rules of Professional Conduct, as adopted by Maryland Rule 16–812, specifically Rules 1.3, Diligence,[2] 1.4, Communication,[3] 1.15,

---

[*] Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court. He also participated in the decision and adoption of this opinion after being recalled pursuant to the Constitution, Article IV, Section 3A.

**1.** Maryland Rule 16–751, as relevant, provides:

> "(a) *Commencement of disciplinary or remedial action.* (1) Upon approval of the Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

**2.** Maryland Lawyers Rules of Professional Conduct Rule 1.3 provides that "a lawyer shall act with diligence and competence in representing a client."

**3.** MLRPC Rule 1.4, as relevant, provides:

> "(a) A lawyer shall:
>
> * * * * * *
>
> "(2) keep the client reasonably informed about the status of the matter;

Safekeeping Property [4] and 8.4, Misconduct,[5] as well as Maryland Rules 16–603 [6] and 16–604.[7]

---

"(3)promptly comply with reasonable requests for information...."

4. MLRPC 1.15, as pertinent, provides:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

\* \* \* \* \* \*

"(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

"(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property...."

5. Rule 8.4, as relevant, provides:

"It is professional misconduct for a lawyer to:

\* \* \*

"(a) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects...."

6. Rule 16–603 provides:

"An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person."

Pursuant to Maryland Rule 16–752(a) [8] and by Order dated July 27, 2011, we referred the matter to Judge Sean D. Wallace of the Circuit Court for Prince George's County for proceedings pursuant to Rule 16–757(c).[9] After a hearing, Judge Wallace made findings of fact and drew conclusions of law, which determined that the respondent violated all of the charged Maryland Rules.

Judge Wallace found the following facts. The respondent, who was admitted to the Maryland Bar on December 19, 1989, met the complainant, Temitope Akojie, a Maryland licensed real estate agent, in December 2009 [10] at a seminar he pre-

---

7. Rule 16–604 provides:

 "Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person."

8. Maryland Rule 16–752(a) states:

 "Order. Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

9. Maryland Rule 16–757(c) provides:

 "(c) Findings and conclusions. The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party."

10. When they first met, Respondent did not practice law for personal reasons, including a difficult recent divorce between him and his wife.

sented in the Exit Premier Realty office. He also "used" office space at the Realty's Apollo Drive office. Following the presentation, Ms. Akojie spoke with the respondent about her involvement in August Real Estate, a New York Limited Liability Company ("LLC"), its debt situation and her desire to establish a Maryland LLC, independent of Exit Premier Realty, for her real estate business. They did not speak again until the next month, in January, 2010.

At that time, Ms. Akojie expressed to the respondent that she "wanted to keep the name August Real Estate Team for her limited liability company in Maryland, that she was willing to assume the debts incurred by Ms. [Amanda] Pinales[, her partner in the New York LLC,] in connection with August and that she wanted him 'to begin work to set up the L.L.C. as a formed corporation in Maryland, also as a single-member L.L.C. which also entailed whatever Respondent needed to do with regards to removing Amanda Pinales as a member, as well as [Ms. Akojie's] assumption of [the L.L.C.'s] assets and liabilities.'" It was not until March 9, 2010 that the parties entered into a Legal Services Agreement. That agreement, printed on the respondent's attorney letterhead, as pertinent, provided:

"Client hereby engages Attorney to perform the following legal services:

a. Assist in establishing August Real Estate Team, LLC, as a Maryland Foreign Limited Liability Company.

b. Assist in establishing August Real Estate Team as a single member LLC.

c. Assist in having assets and liabilities of August Real Estate Team LLC transferred to exclusive control, responsibility and ownership of Client."

Ms. Akojie agreed to pay the respondent "for performing the above and described matter at a flat fee of $3000.00 of which $2000.00 shall be due upon execution of the agreement."

---

At some unknown point shortly after he and Ms. Akojie met, however, Respondent began to reorganize his legal practice.

After signing the agreement, Ms. Akojie gave the respondent a personal check, payable to him, in the amount of $2,000.00. The respondent deposited the check in his personal checking account, rather than in his attorney trust account, required by Title 16, Chapter 600 of the Maryland Rules, to be maintained for the receipt and safekeeping of client funds. In fact, the respondent did not have an active attorney trust account when he deposited the $2,000.00 check from Ms. Akojie.[11] The respondent did not obtain Ms. Akojie's informed consent, either within the written Legal Services Agreement or confirmed separately in writing, to cash her $2000.00 fee check immediately rather than depositing same in a client trust fund for safekeeping until the fee was earned.

Rejecting the respondent's testimony that he began work on Ms. Akojie's matter in January, after their conversation, Judge Wallace, by clear and convincing evidence, found that there was no attorney client relationship established until the Legal Services Agreement was executed. Any work done on the case was, he determined, was "lay[ing] the groundwork for the possible future representation." Judge Wallace also was convinced that there was no attorney client relationship by the terms of the Legal Services Agreement: it provided that the term of the agreement would "commence" when the agreement was signed by the parties and "the client submits the requested engagement amount" and it defines the effective date, consistently, as "as of the date it is executed by all parties and Client has submitted payment of the requisite retainer deposit."

After the representation agreement was signed and the respondent deposited Ms. Akojie's check for $2,000.00, the respondent's communication with Ms. Akojie and work on the matters for which he was retained were "sporadic," with the only documented exchanges between Respondent and Ms. Akojie being by means of electronic mail. In an April 17, 2010

---

11. The respondent testified that he previously had maintained an escrow account, which he "closed out" with a zero balance prior to December 2009.

email to the respondent, Ms. Akojie expressed her frustration at not having been able to speak to him more frequently and the frustration of Ms. Pinales, from whom the representation required him to obtain debt information, in trying to reach him. She concluded, "[w]e would like to stop our services and request for [sic] a refund of our funds."

Although in response to the April 17th email, the respondent promptly arranged a meeting with Ms. Akojie, which he followed up with written instructions designed to result in the transfer of Ms. Pinales' interest in the New York LLC to Ms. Akojie and setting a goal for when "complete" discussions with creditors would be held, "by May 30th," and all interests in rental property would be transferred, "the end of June," neither self-imposed deadline was met. Ms. Pinales provided the respondent with the information about the multiple accounts she had opened in connection with the New York LLC and, as early as April 27, faxed to him the signed authorizations he would need to negotiate with those creditors. The respondent did not acknowledge receiving the faxed documents until May 14, 2010. With regard to communicating with those creditors, the respondent testified that he made efforts, by phone, to do so, but provided no notes or other records to confirm that he did. He conceded that he did not send any of them any written correspondence.

Throughout May and June of 2010, Ms. Akojie attempted to contact the respondent, leaving "multiple voice mail messages . . . but did not hear back from him for 'probably a couple of weeks.'" When the respondent did call back in June, he proposed continued representation on a pro bono basis and additional representation in an unrelated, separate employment matter. That proposal was refused, as Ms. Akojie had decided to terminate the respondent's representation, which she did in an email on July 8, 2010. In that email, she requested return of her "initial deposit of $2,000" and "paperwork." Return of the latter had been promised the day before, when, in a phone call, the respondent told Ms. Akojie that "his secretary 'would contact [her] and provide the paperwork before 2 pm that day.'" On July 14, Ms. Akojie sent

another email, this one reminding the respondent that his secretary stated to her "last week that my check would be ready by the 15th." Acknowledging his agreement to refund the $2000, in a letter the same day, he advised that the processing of the check would take between 10 and 14 days. Ms. Akojie filed her complaint with the petitioner, which wrote to the respondent on August 9, 2010. When the refund was not received by July 30, Ms. Akojie again inquired about the refund check, by emails dated July 30 and August 12. The respondent refunded the $2000 in a letter dated August, 21, 2010, causing the court to find, "Respondent did not act to issue the refund of $2000, which he previously had promised to Ms. Akojie within "10–14 days" of July 15, 2010, until after Respondent received notification of Ms. Akojie's grievance via Bar Counsel's correspondence dated August 9, 2010."

From these factual findings, the hearing court drew conclusions of law, as follows. First, with regard to the $2000 fee payment, it concluded that the respondent violated MLRPC 1.15. Because the fee had not been earned when paid and, instead, was intended to be applied to the future legal services described in the retainer agreement the parties executed, the respondent violated MLRPC 1.15(a) by not depositing that fee into an attorney trust account, which Title 16, Chapter 600 requires lawyers to maintain. Without informed consent, confirmed in writing, having been given by the client, that same conduct violates MLRPC 1.15(c). The client gave no such consent in this case. From the fact that the respondent did not maintain an attorney trust account, the hearing court concluded that the respondent also violated Rule 16–603.[12]

The refund of the $2000 fee payment also was central to the hearing court's conclusions with respect to the respondent's

---

12. The hearing court drew no express conclusion with respect to the respondent's violation of Rule 16–604. While it concluded from the factual finding that the respondent did not maintain a lawyer trust account, that he violated Rule 16–603, which requires the maintenance of such an account, it did not conclude from the fact that the respondent accepted funds from a client and did not deposit them in a trust account that the respondent had violated Rule 16–604.

compliance with MLRPC 1.15(d) and 1.16(d). Having acknowledged in writing to Ms. Akojie that he was going to refund her $2,000.00 payment within 10–14 days, the court concluded that Ms. Akojie was entitled to receive those funds and, therefore, that the respondent's failure to meet his self-imposed deadline for refunding them violated MLRPC 1.15(d), as their delivery was not "prompt." Inasmuch as the promised $2000.00 refund was a result of her termination of the respondent's representation, the court also concluded that the failure to surrender those funds promptly violated MLRPC 1.16(d), as well.

Second, with regard to the diligence charges, the hearing court concluded:

"As part of the representation he agreed to undertake on behalf of Ms. Akojie, Respondent was responsible for contacting the various creditors identified by Ms. Panales and finding out what arrangements could be made to transfer the subject debts to Ms. Akojie or otherwise resolve such debts. Despite having written authorization from Ms. Panales by April 27, 2010, and setting a May 30, 2010 deadline 'to complete discussions with all creditors,' Respondent did not complete this task with reasonable diligence and promptness. He failed to send any written correspondence to the creditors and produced no documentary evidence that he had any substantive communications concerning the transfer or other resolution of such debts. Because he failed to act with reasonable diligence and promptness to deal with the debt issues, he could not move forward with completing the other contemplated aspects of the representation, involving the establishment of August Real Estate Team as a single-member limited liability company for Ms. Akoyie. In summary, Respondent did not act with reasonable diligence and promptness to perform any of the three itemized legal services set forth in his Legal Services Agreement with Ms. Akoyie. This court concludes that such failure on Respondent's part violated MLRPC 1.3."

A violation of MLRPC 1.4(a)(2) was found by the hearing court because of the respondent's failure to keep Ms. Akojie

"reasonably informed about his communications with the various creditors and what actions may be required of her." MLRPC 1.4(a)(3) was violated when the respondent did not promptly respond to Ms. Akojie's various and numerous electronic mail messages.

The hearing court finally concluded that the respondent violated MLRPC 8.4(a). His reasoning was straight-forward: "by violating other Rules of Professional Conduct as described herein, it follows that Respondent engaged in professional misconduct under MLRPC 8.4(a)." [13]

The petitioner took no exceptions [14] to the findings and conclusions made by the hearing court, but it did make a recommendation for sanction, that the respondent be indefinitely suspended from the practice of law. In addition to the violations found by the hearing court in the instant case, the petitioner factors into its recommendation calculus, as an aggravator, see American Bar Association Standards for Imposing Lawyer Sanctions (1991), § 9.22(a), the fact that the respondent, who is the subject of a reciprocal discipline petition involving the same alleged misconduct, was suspended by the District of Columbia, for 60 days for violation of the District of Columbia equivalent of Maryland Rules 8.4(c) and 1.17(b)(1). When this prior disciplinary sanction is considered with another aggravating factor, see § 9.22(d), "the multiple violations in the present case ...", the petitioner concludes that "the appropriate discipline for Respondent should certainly be no less than an indefinite suspension."

---

**13.** The respondent did not except to this conclusion of law or to the findings of fact underlying it. Nevertheless, it does not follow from the violation of just any of the other Rules of Professional conduct that the respondent has "commit[ted] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respect." MLRPC 8.4(b).

**14.** Maryland Rule 16–758 provides, in pertinent part:

"Exceptions; recommendations. Within 15 days after service of the notice required by section (a) of this Rule, each party may file (1) exceptions to the findings and conclusions of the hearing judge and (2) recommendations concerning the appropriate disposition under Rule 16–759(c)."

The respondent filed exceptions to the findings of fact and the conclusions of law flowing from those findings that he believes, and therefore argued, are "crucial" to finding that he violated the charged Rules and, on that basis and for that reason, recommends that the Court dismiss all charges. These findings of fact, and the related conclusions, are (1) that there was no lawyer client relationship established between the respondent and Ms, Akojie prior to the execution of the legal services agreement; (2) that the partial fee paid when the agreement was executed was not then earned and was paid in anticipation of future services; (3) that the only documented communications between the respondent and Ms Akojie was via electronic mail; (4) that the respondent failed to acknowledge receipt of faxed documents until May 14, 2010, long after they had been faxed; and (5) that he did not communicate with Ms. Akojie's creditors in writing and failed to produce notes or other records reflecting the communications he did engage in.

With regard to the attorney client relationship issue, the respondent relies on this Court's acknowledgment, in *Attorney Grievance Comm'n v. James*, 355 Md. 465, 467–77, 735 A.2d 1027, 1033 (1999), that neither the existence, or not, of an attorney client agreement nor payment for the services rendered is dispositive of whether such a relationship has been formed. In that regard, he also emphasizes what we said on the subject of when an attorney client relationship comes into being in *Attorney Grievance Comm'n v. Brooke*, 374 Md. 155, 174, 821 A.2d 414, 425 (2003):

> "Many courts have adopted the following standard to assess whether the relationship has been established: An attorney-client relationship is said to be have been created when (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance."

Proceeding on those premises, he argues that his attorney client relationship with Ms. Akojie was formed well prior to

March 2010, when the parties executed a legal services agreement and Ms. Akojie paid the partial fee to the respondent. This is borne out, he submits, by the conceded facts that Ms. Akojie consulted him in the fall of 2009 about a matter within his professional competence and that he agreed to give advice and assistance, as demonstrated by his having met with her on the subject subsequently on more than one occasion, including with her business partner, whose part of the business she was interested in assuming. In addition, the respondent maintains that he began work on the matter, aside from the meetings, two by conference call with Ms. Akojie and Ms. Pinales, he reviewed the public records of the New York LLC, "began looking at the terms, amounts owed and began negotiating debt relief on behalf of Ms. Pinales," reviewed the documentation of the debt Ms. Akojie and Ms. Pinales incurred and reviewed Ms. Akojie's corporate status in the State of Maryland. Moreover, the respondent asserts that Ms. Akojie acknowledged that he was acting on her behalf. In support, he points to her testimony on cross-examination, in which she admitted that, in January and February, 2010, the respondent was providing her with information and discussing her concerns related to her company and business.

Conceding that the terms of the legal services agreement are what they are, the respondent's exception to the finding that the partial fee payment was made "in anticipation of future legal services to be rendered by Respondent and that the fee had not yet been earned at the time of its receipt" is based on "other evidence presented at trial which demonstrated that the $2000 had been earned and was not just paid in anticipation of future legal services." More particularly, he directs our attention to the evidence that the total fee was $3000, of which $2000 was payable "as soon as possible" and that he agreed to continue reviewing the matter pertaining to the New York LLC. Also of significance, the respondent submits, is his testimony concerning his professional experience, the hours he expended on the Akojie matter and his fee charges. According to that testimony, the $2000 fee had been

earned when paid even when discounted or his lowest hourly rate was applied.

Excepting to the finding that "[t]he only documented communications between [the respondent and Ms. Akojie] occurred by electronic mail," the respondent relies on his testimony at the hearing. More specifically, he points to an email, which sought to determine the availability of Ms. Akojie and Ms. Pinales for a conference call and the record of that conference call.

As noted, the hearing court found that the respondent did not acknowledge receipt of documents faxed to him on April 27, 2010 until May 14, 2010. The respondent's exception is that there is no evidence that he received a fax on April 27, 2010 from Ms. Pinales. He supports that assertion with emails, one to Ms. Akojie and Ms. Pinales and another to Ms. Pinales, from him, both post April 27, inquiring about the faxed documents and a fax receipt notification email, also post April 27.

To the court's finding that he did not send written correspondence to any of the creditors and produced no notes or other records reflecting any such communication, the respondent, in excepting, responds that documentary evidence and the testimony of both the respondent and Ms. Akojie belie that finding. The documentary evidence on which the respondent relies consists of the authorizations, which he prepared and forwarded to the creditors. He also claims that Ms. Akojie testified that she had been told by the respondent that he had been in contact with Chase, one of the New York LLC's creditors and knew that he had been in contact with Citibank, as well.

Because the court's conclusions of law are drawn from the facts it found, the respondent also excepts to them. Thus, the respondent argues, if his exceptions to the findings of fact are sustained so too would the corresponding exceptions to the conclusions of law. Therefore, for the reason that the $2000 partial fee had been earned when received, he submits that he "would not be in violation of Rule 1.15(a) or (c)

of the Rules of Professional Conduct [and] would not have been in violation of Maryland Rule 16–603, because he would not have been in receipt and acceptance of trust money. . . ." Similarly, MLRPC 1.3 and 1.4(a)(2) would not be sustainable for the reason that "[the respondent] did not acknowledge receipt of the faxes until May 14, 201[0], because that was the day he actually received them, and he communicated with Ms. Akojie via teleconference as well as electronic mail" and documents presented at the hearing and Ms. Akojie's testimony demonstrate that he communicated with the creditors as required. With regard to MLRPC Rules 1.15(d) and 1.16(d), he asserts:

". . . [The respondent] was not required to remit any funds because he had earned the fees. Ms. Akojie was not entitled to receive any funds at all, however, [the respondent] was aware of her financial situation and chose to refund her money and consider the work on her matter pro bono. [The respondent] should not be found in violation of Rules 1.15(d) and Rule 1.16(d) for not 'promptly' remitting funds that he did not have to remit, but choose to remit."

Maryland Rule 16–759(b) provides:

"(1) Conclusions of Law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

"(2)Findings of Fact.

"(A) If No Exceptions Are Filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.

"(B) If Exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."

Explicating this Rule, we said in *Attorney Grievance Comm'n v. Goff*, 399 Md. 1, 27–28, 922 A.2d 554, 569–70, reinstatement granted, 400 Md. 97, 928 A.2d 795 (2007):

> "Thus, we review de novo the hearing court's conclusions of law. Rule 16–759(b)(1); *Attorney Grievance Comm'n v. Mahone*, 398 Md. 257, 265–66, 920 A.2d 458, 463, 2007 WL 1051696, \*4 (2007); *Attorney Grievance Comm'n v. Mba–Jonas*, 397 Md. 690, 700, 919 A.2d 669, 675, 2007 WL 816836, \*4 (2007); *Attorney Grievance Comm'n v. Hodgson*, 396 Md. 1, 6–7, 912 A.2d 640, 644 (2006); *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Attorney Grievance Comm'n v. Joehl*, 335 Md. 83, 88, 642 A.2d 194, 196 (1994) (noting that the ultimate decision as to whether an attorney has engaged in professional misconduct rests with this Court). When the factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled. *Mba–Jonas*, 397 Md. at 700, 919 A.2d at 675; *Attorney Grievance Comm'n v. Manger*, 396 Md. 134, 146–147, 913 A.2d 1, 8 (2006). Moreover, a hearing court's findings of fact will not be overruled unless we determine that they are clearly erroneous. *Mahone*, 398 Md. at 265, 920 A.2d at 463; [*Attorney Grievance Com'n of Maryland v.*] *Guida*, 391 Md. 33 at 50, 891 A.2d [1085] at 1095 ( (2006) ). 'Weighing the credibility of witnesses and resolving any conflict in the evidence are tasks proper for the fact finder.' *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323, 331 (1998)."

*See also Attorney Grievance Comm'n v. Tanko*, 408 Md. 404, 418–19, 969 A.2d 1010, 1019 (2009); *Attorney Grievance Comm'n v. Harris*, 403 Md. 142, 155–56, 939 A.2d 732, 740 (2008); *Attorney Grievance v. Zuckerman*, 386 Md. 341, 363, 872 A.2d 693, 706 *reinstatement granted sub nom. Attorney Grievance Comm'n v. Zuckerman*, 387 Md. 326, 875 A.2d 132 (2005). Moreover, attorney discipline proceedings are within this Court's original and complete jurisdiction, *Attorney Grievance Comm'n v. James*, 385 Md. 637, 654, 870 A.2d 229, 239 (2005); *Attorney Grievance Comm'n v. O'Toole*, 379 Md. 595, 604, 843 A.2d 50, 55 (2004), and the hearing judge's findings

must be supported by clear and convincing evidence. *Attorney Grievance Comm'n v. Gore,* 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004).

██ As we have seen, the hearing court found that the respondent did not form an attorney client relationship with Ms. Akojie until they executed a legal services agreement, at which time the respondent was paid two-thirds of the agreed-upon fee. That finding was based on the agreement itself,[15] which expressly stated that the term of the agreement would commence when the agreement was executed and the partial fee was paid. It was also significant to the hearing court that:

"[t]he Legal Services Agreement between Ms. Akojie and Respondent contained no provision recognizing that any

---

**15.** To be sure, and to be clear, a written agreement establishing the terms of a lawyers representation is not dispositive of the existence of an attorney client relationship. *Attorney Grievance Comm'n v. Shoup,* 410 Md. 462, 489, 979 A.2d 120, 136 (2009). Our cases, as the respondent has pointed out, see *Attorney Grievance Comm'n v. James,* 355 Md. 465, 467–77, 735 A.2d 1027, 1033 (1999); *Attorney Grievance Comm'n v. Brooke,* 374 Md. 155, 174, 821 A.2d 414, 425 (2003), confirm this point. Whether an attorney-client relationship had been formed and when, is a question of fact, (*see e.g., Attorney Grievance Comm'n of Maryland v. Coppola,* 419 Md. 370, 392, 19 A.3d 431, 444 (2011); *Attorney Grievance Comm'n of Maryland v. Ruddy,* 411 Md. 30, 77, 981 A.2d 637, 664 (2009); *Shoup,* 410 Md. 462, 490, 979 A.2d 120, 136), and not a question of law. Accordingly, the test for review is clear error. Under that standard, we consider the evidence with "due regard" for the judge's factual determinations, and "in a light most favorable to the prevailing party[.]" Our review of the judge's factual findings ceases where there exists substantial evidence in the record to support that judge's findings. *Clickner v. Magothy River Ass'n Inc.,* 424 Md. 253, 266, 35 A.3d 464, 472 (2012) (citing *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 835–36 (1975)).

We do not understand the hearing judge's reference to, and reliance on, the Legal Services Agreement to be anything other than the statement of his basis for rejecting the respondent's testimony and conclusion that an attorney-client relationship had been formed. Nor do we understand the corroborating evidence from Ms. Akojie to be a statement of her belief that such a relationship had been formed. We simply do not accept that it is error to determine that an attorney-client relationship does not exist merely because the record contains contrary evidence. That, however, will be the result if, despite the hearing judge's clear finding, we were to conclude nevertheless that an attorney client relationship had been formed.

portion of the stated fee amount was for any legal services rendered prior to March 9, 2010. Respondent maintained no time sheets or other records of time he claimed to have spent on Ms. Akojie's matter during the months of January and February 2010."

From this finding, that the attorney client relationship did not form until March 9, the court made the further finding that the partial fee payment was made in anticipation of future services and not for past legal services rendered.

Neither of these findings nor the basis for them is clearly erroneous. To be sure, the respondent testified consistently with an attorney client relationship having been formed prior to March 9, 2010 and there is some testimony by Ms. Akojie that may support his testimony. In addition, referencing his experience, his fee schedule, and the work he maintained he did pursuant to his engagement by Ms. Akojie, he testified that he had already earned the partial fee when it was paid. It is also true that this testimony and any corroborating testimony by Ms. Akojie would support the factual finding that the respondent advocates. It is well settled, however, that the court was not obliged to credit the respondent's testimony. *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002); *Attorney Grievance Comm'n v. Kerpelman,* 288 Md. 341, 363, 420 A.2d 940, 950 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981). Indeed, we have said that "[t]he hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe." *Monfried,* 368 Md. at 390, 794 A.2d at 101. In fact, the hearing judge may "pick and choose which evidence to rely upon." *Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 253, 760 A.2d 1108, 1118 (2000). The court obviously did not credit the respondent's testimony, opting instead to rely on the more objective legal services agreement, both for the terms it contained, as well as those it did not. Accordingly, these exceptions are overruled.

Not only are these factual findings not clearly erroneous, they support the conclusions of law drawn from them

by the hearing court. Therefore, we overrule the respondent's exceptions to the conclusions of law flowing from these factual findings. We repeat, in that regard, what we said in *Attorney Grievance Commission of Maryland v. Robertson,* "[w]hen the factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled." 400 Md. 618, 629, 929 A.2d 576, 583 (2007). Because we conclude that there was no attorney client relationship until March 9, 2010, when the legal services agreement was executed, we also conclude, as did the hearing court, that the partial fee payment could not have been earned and necessarily was made in anticipation of future legal service, rendering such payment, at the time it was made, trust funds. Because the respondent did not deposit these funds into an attorney trust account that he was required to, but did not, maintain and, in addition, did not obtain the client's informed consent to do otherwise, it follows that he violated the charged provisions of the relevant MLRPC Rule: 1.15(a) and (c). By not maintaining a lawyer's trust account, which is conceded, the respondent also violated Maryland Rule 16–603.

The factual finding that the $2000 partial fee payment constituted trust funds is dispositive of the respondent's exceptions to the hearing court's conclusion of law that he violated MLRPC Rules 1.15(d) and 1.16(d) by not promptly refunding it after his services had been terminated by his client. The sole basis for these exceptions is that the payment did not consist of trust funds because he had already earned the payment before it was made. We rejected that basis when we considered whether an attorney client relationship predated the parties' legal services agreement.

The next three exceptions by the respondent address findings related to the method the respondent used to communicate with his client, the timeliness of his acknowledgment of faxed documents and whether and how he communicated with creditors of his client in furtherance of the legal undertaking for which he had been retained. They also are to the relevant

conclusions of law that the hearing court drew from these factual findings.

The factual findings made by the hearing court, to which the respondent excepted, were a part of a larger, more general, finding with respect to the diligence with which the respondent pursued his client's matter and communicated with her to keep her apprised of his progress. Because the gravamen of the Rule 1.3 and 1.4 violations is the failure to act diligently and promptly and to keep the client informed, particularly answering her inquiries timely and promptly, it was critical to the petitioner's case with regard to those Rules that, having been roused from a sporadic approach to his client's matter by an email indicating frustration in her attempts to communicate with him about her case to the point that she was contemplating the termination of his services, the respondent set certain goals for the representation and then failed to meet those goals.

In proving its case, the petitioner presented evidence of the communications between the respondent and his client, specific instances of mis-communication and of the manner in which the respondent interacted and communicated with the client's creditors in pursuit of the accomplishment of the goal he set. To be sure, the hearing court made factual findings with regard to some of this evidence. With regard to the finding that the only documented communication between the respondent and Ms. Akojie was by electronic mail, we believe that the hearing court may have over-stated or over-emphasized the limited manner in which the respondent communicated with his client, or documented that fact. Accordingly, we sustain his exception to that finding. We likewise are satisfied that the respondent is correct, the documentary evidence demonstrates that the respondent did not receive the faxed authorizations until May 14, even though they were faxed on April 27, and thus that the hearing court's finding in that regard is clearly erroneous. This exception also is sustained. On the other hand, we overrule his exception to the court's finding with regard to the respondent's communications with creditors.

The above factual findings to which the respondent excepted, viewed in context, were more peripheral, rather than central, to larger, more general findings establishing the respondent's lack of diligence and failure to keep his client adequately informed. Therefore, the fact that the respondent may have communicated with his client in ways other than electronic mail, and may have documented those other methods, does not answer or negate the allegation that, nevertheless, he was not diligent and did not keep his client well informed about her matter. In a similar vein, we do not regard the fact that the respondent really did not receive the faxed documents until the day he acknowledged receiving them as undermining the finding by the hearing court that, in other respects, he failed to act diligently. The respondent's exceptions to the hearing court's conclusion that he violated MLRPC Rules 1.3 and 1.4(a)(2) and (a)(3) are, therefore, overruled.

Having disposed of the respondent's exceptions, resulting in the sustaining of the charges lodged against him, we turn to the determination of the appropriate sanction. We do so fully cognizant that the purpose, the goal, of attorney discipline is well settled., "to protect the public, not to punish the erring attorney." *Goff*, 399 Md. at 30, 922 A.2d at 571, *reinstatement granted,* 400 Md. 97, 928 A.2d 795 (2007). *See Mba–Jonas,* 397 Md. at 703, 919 A.2d at 677; *Attorney Grievance Comm'n v. Rees,* 396 Md. 248, 254, 913 A.2d 68, 72 (2006). This purpose and goal are achieved "when the sanctions are commensurate with the nature and gravity of the violations and the intent with which they were committed" *Attorney Grievance Comm'n v. Stein,* 373 Md. 531, 533, 819 A.2d 372, 375 (2003). We approach each matter on its own merits, focusing on, and considering, the facts and circumstances involved, *Attorney Grievance Comm'n v. Gisriel,* 409 Md. 331, 385, 974 A.2d 331, 362 (2009); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 300, 614 A.2d 102, 114 (1992); *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 680, 496 A.2d 672, 680 (1985), including any mitigating factors, *see Attorney Grievance Comm'n v. Atkinson,* 357 Md. 646, 656,

745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998), and with an eye toward the promotion of general and specific deterrence, *Attorney Grievance Comm'n v. Sliffman,* 330 Md. 515, 529, 625 A.2d 314, 321 (1993); the protection of the integrity of the legal profession, *Attorney Grievance Comm'n v. Cassidy,* 362 Md. 689, 698, 766 A.2d 632, 637 (2001); and furthering the public's confidence in the legal profession, *Attorney Grievance Comm'n v. Christopher,* 383 Md. 624, 639, 861 A.2d 692, 701 (2004); *Stein,* 373 Md. at 537, 819 A.2d at 375; *Powell,* 369 Md. at 474, 800 A.2d at 789. We have also made clear that "[t]he severity of the sanction to be applied is measured by the egregiousness of the misconduct under the particular facts and circumstances of the case." *Gisriel,* 409 Md. at 385–86, 974 A.2d at 363, citing *Attorney Grievance Comm'n v. Montgomery,* 318 Md. 154, 165, 567 A.2d 112, 117 (1989) ("the extent of the discipline to be applied is generally dependent upon the severity of the misconduct and the particular facts and circumstances surrounding it."). Other relevant considerations are "the attorney's prior grievance history[,] . . . the attorney's remorse for the misconduct, and the likelihood of the conduct being repeated." *Attorney Grievance Comm'n v. Post,* 379 Md. 60, 71, 839 A.2d 718, 724–25 (2003).

 The petitioner's recommendation that the respondent be sanctioned by being indefinitely suspended from the practice of law is based on both the fact that the respondent has been found to have violated multiple Rules of Professional Misconduct, which, according to the American Bar Association Standards for Imposing Lawyer Sanctions (1991), § 9.22(d) is a factor in aggravation, and the nature of those violations, as well as his prior disciplinary history. Of particular significance is the trust account violations, that he did not have and maintain a trust account and, therefore, could, and did, not deposit trust funds into a trust account. The respondent's lack of diligence in pursuing the client's matter and in refunding her funds and failure to keep his client informed likewise inform the recommendation.

Without regard to the respondent's disciplinary history, the violations in this case, standing alone, are enough to justify an indefinite suspension, the petitioner submits, relying on *Attorney Grievance Comm'n v. Patterson,* 421 Md. 708, 28 A.3d 1196 (2011), reconsideration denied (Oct. 24, 2011). There, in the representation of clients in several cases, Patterson violated numerous Rules of Professional Conduct, including trust account violations under Rules 1.15, 16–606.1, and 16–609(c), not being diligent in the pursuit of his clients' cases under Rule 1.3, failing to communicate sufficiently with his clients under Rule 1.4(b), and failing to respond to repeated requests by Bar Counsel for information about the cases under Rule 8.1. *Patterson,* 421 Md. at 740, 28 A.3d at 1215. Patterson also failed to take responsibility for his lack of diligence. *Id.* at 737, 28 A.3d at 1213. His only mitigation was that he suffered from MS, but that, this Court concluded, only partially excused his inaction, and that only with regard to his failure to respond to Bar Counsel. *Id.* at 743, 28 A.3d 1196, 1216–17. When the reciprocal discipline the respondent received as a result of a negotiated discipline agreement accepted by the District of Columbia Court of Appeals is considered, the petitioner asserts, the case for an indefinite suspension is only strengthened.

The respondent recommends that the disciplinary action be dismissed. The recommendation is premised on the success of his exceptions:

"It is obvious from what has been presented in these exceptions that the Court could not find by clear and convincing evidence that no attorney-client relationship existed between Mr. Stillwell and Ms. Akojie; that the $2000 fee paid by Ms. Akojie was in anticipation of future legal services; that the only documented correspondence between Mr. Stillwell and Ms. Akojie was by email; that Mr. Stillwell failed to acknowledge receipt of the authorization letters soon after they were sent. All of these findings of fact by the court were crucial in its decision to find Mr. Stillwell in violation [of the Rules violations]. Since these facts cannot be proven by clear and convincing evidence, this action

should be dismissed or the court should find that [ ] if these were a technical violation, there should be no sanction in the matter."

As we have seen, we do not agree with the respondent, having overruled, in substantial part, his exceptions.

The petitioner is correct, the respondent was charged in this Court, in a reciprocal discipline action, with violating MLRPC 8.4(c) and 1.7(b)(1), as a result of the respondent's negotiated discipline agreement in the District of Columbia, in which he admitted violating the District of Columbia version of those Rules. Rather than acquiesce in the discipline imposed by the District of Columbia Court of Appeals, a 60 day suspension, the petitioner, in its answer to the Show Cause Order issued in the case, sought disbarment or, alternatively, an indefinite suspension from the practice of law. Although agreeing with the petitioner that reciprocal discipline was not, under the circumstances, appropriate, but rejecting its sanction recommendation in other respects, we imposed a 6 month suspension. *Attorney Grievance Comm'n of Maryland v. Stillwell*, 434 Md. 69, 73 A.3d 243 (2013).

The petitioner asserts that the respondent's violations in the present case rise to the level of the violations found, and sanctioned, in *Attorney Grievance Comm'n of Maryland v. Patterson*, 421 Md. 708, 28 A.3d 1196 (2011), reconsideration denied (Oct. 24, 2011), and, therefore, that the sanction imposed in that case should also be imposed in this one. Like the respondent in Patterson, the respondent in the present case violated Rules of Professional Conduct involving attorney trust accounts, by failing to exercise diligence in conducting his representation of Ms. Akojie, and by failing to communicate timely with his client. See *Patterson*, 421 Md. at 743, 28 A.3d at 1216–17. We believe, however, that the violations at issue in Patterson were more egregious. The respondent in Patterson, unlike the respondent in the present case, committed each of the aforementioned violations multiple times with multiple clients. See *id.* He also failed, despite agreeing to do so, to refund all of his client's funds. See *id.* at 735–736, 28 A.3d 1196 (concluding that the respondent's collection of an

unreasonable fee, and his subsequent failure to refund the fee to his client, violated Maryland Rule 1.16(d)). By contrast, the respondent in the present case fully refunded, albeit not expediently, the money tendered by Ms. Akojie as part of the Legal Services Agreement. Furthermore, in *Patterson*, the respondent was found to have violated MPRC 8.1, which provides, inter alia, that "a lawyer ... in connection with a disciplinary matter, shall not knowingly fail to respond to a lawful demand for information from ... [a] disciplinary authority[.]" See *id.* at 738–39, 28 A.3d at 1214. In short, the respondent in *Patterson* failed to cooperate with Bar Counsel with respect to two separate client complaints. See *id.* The record shows that the respondent in this case has cooperated fully with Bar Counsel, and provided all information requested to assist in his investigation.

We acknowledge, as the petitioner emphasizes, that "this case involves multiple violations in the representation of a client, including safekeeping property infractions, but without misappropriation or other dishonest conduct." In other cases, where the offending attorney has mishandled client funds, but not as the result of dishonest conduct, we have suspended the offending attorney indefinitely with the right to apply for readmission after a period of time. For example, in *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 872 A.2d 693 (2005), the offending attorney violated several rules of the MLRPC, including MLRPC 1.15, due to employee theft and ineffectual accounting procedures. *Id.* at 369, 872 A.2d 693, 710. We suspended the respondent in that case indefinitely with the right to apply for readmission after 30 days, noting inter alia the lack of intentionally dishonest conduct on the part of the offending attorney. *Id.* at 386, 872 A.2d at 720. In *Attorney Grievance Comm'n v. Sperling*, 380 Md. 180, 844 A.2d 397 (2004), the respondent was found to have violated, among other Rules, MLRPC 1.15, had been previously sanctioned, and was found to have operated a relatively large negative balance to his client trust account (approximately $40,000), but was not accused of dishonest conduct in relation to his handling of client funds. *Id.* at 193, 844 A.2d at 405. In

that case, we suspended Sperling indefinitely, with the right to apply for readmission after 90 days. *Id.*

The public interest and legal profession, we have long maintained, is protected by the issuance of a sanction that reflects the importance of fidelity to the Maryland Rules of Professional Conduct, particularly with respect to the handling of clients funds, diligence, and competence. Based on the facts of the present case, the violations committed, the aggravating and mitigating factors present, and our prior decisions involving similar misconduct, we conclude that the appropriate sanction is an indefinite suspension from the practice of law in the State of Maryland. The respondent shall have the right to apply for readmission to the practice of law after 60 days.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GARLAND H. STILL-WELL.

ADKINS and CATHELL, JJ., Concur.

ADKINS, J., concurring, in which CATHELL, J., joins

Although I concur in the judgment of the Majority, I fear that the Majority opinion could be interpreted as grounds to sanction diligent, rule-abiding, attorneys. Often an attorney is asked to "jump right on" a client's problem, before execution of a formal retainer agreement, and thereafter will take a portion of the retainer commensurate with the work they have already done. In this case, the hearing court found that no attorney-client relationship was formed until the formal retainer agreement was executed; therefore, it was impermissible for the attorney to allocate a portion of the retainer for work previously done. Most respectfully, I disagree with the Majority's deference to the hearing court's conclusion because it inappropriately stresses the importance of a retainer agreement and will discourage attorneys from promptly beginning

working on a client's matter until after the agreement is signed and the retainer paid.

As the Majority acknowledges, the hearing judge's finding that no attorney-client relationship existed prior to the execution of the formal retainer agreement "was based on the agreement itself." The hearing judge read the contract, which stated that "this Agreement will commence as of the date this Agreement has been signed by both Attorney and Client below and Client submits the requested engagement amount." Then, noting that the agreement "contained no provision recognizing that any portion of the stated fee amount was for any legal services rendered prior to [executing the retainer,]" dismissed anything that happened before signing the retainer as simply "an effort to lay the groundwork for the possible future representation." In short, the hearing judge read the plain language of the contract, dismissed any contradictory evidence, and found that no relationship was created until the retainer was signed and paid.

What the hearing judge did, and what the Majority approves, might be viewed as simply applying the parol evidence rule to interpret the contract. The hearing judge found the retainer clear and unambiguous in setting forth the beginning date for the representation; therefore, the judge declined to consider any parol evidence that would contradict the written contract. Although this approach may be appropriate in contractual disputes—as, for example, a fee dispute between attorney and client—it falters in the context of an attorney grievance proceeding.

As the Majority acknowledges that, in attorney grievance proceedings, the formal retainer contract does not determine when an attorney-client relationship has been formed. This Court has repeatedly recognized that, in forming an attorney-client relationship, no formal contract or retainer agreement is necessary:

> Although an agreement upon the amount of a retainer and its payment is rather conclusive evidence of the establishment of the attorney-client relationship, the absence of such

an agreement or payment does not indicate conclusively that no such relationship exists. Indeed, the payment of fees is not a necessary element in the relationship of attorney and client. The services of an attorney to the client may be rendered gratuitously but the relationship of attorney and client nonetheless exists.

*Attorney Grievance Comm'n of Maryland v. Brooke,* 374 Md. 155, 173–74, 821 A.2d 414, 424 (2003) (citations and quotation marks omitted). Indeed, our case law is settled on this point: "Our cases make clear that an explicit agreement or payment arrangement is not a prerequisite to the formation of an attorney-client relationship." *Attorney Grievance Comm'n v. Shoup,* 410 Md. 462, 489, 979 A.2d 120, 136 (2009).[16] In fact, our Rules of Professional Conduct acknowledge that a written retainer agreement can be provided to the client **after** the representation has already commenced: "The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation[.]" Maryland Lawyers Rules of Professional Conduct 1.5(b).

Thus, contrary to the contractual interpretation approach taken by the hearing judge, our decisions and Rule 1.5(b) make clear that the determination of an attorney-client relationship is not based on a formal contractual retainer agreement. Rather, we recognize that "[t]he facts and circumstances of each particular case are critical in determining whether an attorney-client relationship exists." *Shoup,* 410 Md. at 489, 979 A.2d at 135. In setting forth the test for determining when the relationship is formed, we have adopted

_____

**16.** *See also Attorney Grievance Comm'n v. Brooke,* 374 Md. 155, 173, 821 A.2d 414, 424 (2003) ("It is not necessary to the relationship that a retainer be requested or paid."); *Attorney Grievance Comm'n v. Shaw,* 354 Md. 636, 650, 732 A.2d 876, 883 (1999) ("The existence of the relationship does not depend on there being a formal fee arrangement."); *Attorney Grievance Comm'n v. Kramer,* 325 Md. 39, 47, 599 A.2d 100, 104 (1991) ("The relationship does not require a formal fee....").

the requirements of the Restatement (Third) of the Law Governing Lawyers:

A relationship of client and lawyer arises when:

(1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either

(a) the lawyer manifests to the person consent to do so; or

(b)the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

(2) a tribunal with power to do so appoints the lawyer to provide the services.

*Shoup,* 410 Md. at 490, 979 A.2d at 136 (quoting Restatement (Third) of Law Governing Lawyers § 14 (2000)).

Thus, the formation of an attorney-client relationship clearly depends on the intent of the parties. This intent must be mutual, and thus calls for a two-part inquiry. One, the client manifests an intent to receive legal services, and, two, the lawyer manifests consent to provide those legal services. According to the Restatement, "The client's intent may be manifest from surrounding facts and circumstances, as when the client discusses the possibility of representation with the lawyer and then sends the lawyer relevant papers or a retainer requested by the lawyer." Restatement (Third) of Law Governing Lawyers § 14 cmt. c. The Restatement makes clear, however, that, "The client need not necessarily pay or agree to pay the lawyer." *Id.* Likewise, in explaining the lawyer's consent, the Restatement explains that the lawyer "may indicate consent by action, for example by performing services requested by the client." *Id.* at § 14 cmt. e. In such a case, "the lawyer's conduct constitutes implied assent" and "a client-lawyer relationship arises when the [client] reasonably relies on the lawyer to provide services." *Id.*

Neither the Majority nor the hearing judge ever set forth this test in making their determination that Respondent and Ms. Akojie failed to form an attorney-client relationship prior

to executing the retainer agreement. Instead, as the Majority states in its opinion, the hearing court's finding "was based on the agreement itself." This is simply not our test for determining when an attorney-client relationship is formed. In other words, the hearing court was not entitled to rely exclusively on the March retainer agreement. It should have examined the intent of the parties throughout January and February. Failure to do so is error.

Nonetheless, the hearing court did examine the amount of work that Respondent performed before depositing the money in his personal account (rather than a trust account.) I concur, rather than dissent because, even if an attorney-client relationship existed before January 2010, the hearing court was not clearly erroneous in finding that Respondent had not earned the $2000 at the time he deposited the money. Respondent argues that he worked on the case for six hours in January and for twelve hours in February, and, at his lowest billable hour rate of $250 per hour, Ms. Akojie would have owed him over $4000 at the time he deposited her $2000 check. But, at the same time, Ms. Akojie disputed, in the hearing court, how much work Respondent really did. Outside of two conference calls, Ms. Akojie testified that no work had been done on her case. And, besides these two conference calls, Respondent was unable to substantiate his claims that he did additional work during January and February. Indeed, the hearing court found that Respondent "maintained no time sheets or other records of time he claimed to have spent on Ms. Akojie's matter during the months of January and February 2010."

Weighing the evidence and the credibility of witnesses is the role of the hearing court. With Respondent's failure to provide any tangible proof of the time he worked on Ms. Akojie's case, I cannot say that the hearing court was clearly erroneous in finding that Respondent had not earned all $2000 at the time he deposited the check into his personal account.

In sum, I concur in the judgment of the Majority, but write separately in an attempt to protect future lawyers who

promptly begin working on a client's matter before executing a formal retainer agreement. I stress that an attorney-client relationship can be formed before signing the retainer agreement, and thus, an attorney can be justified in immediately applying a portion of the after-acquired retainer to pay for work already done. We should not discourage attorneys from promptly beginning work on a client's matter, even before signing a formal retainer agreement. Based on the hearing court's findings, and the Majority opinion, however, it would be wise for attorneys to include language, in their retainer agreements, that a portion of the retainer fee can be used to pay for work done prior to the effective date of the retainer agreement.

Judge CATHELL authorizes me to state that he agrees with the views set forth in this concurring opinion.