*Attorney Grievance Commission of Maryland v. Andrew Ndubisi Ucheomumu*, Misc. Docket AG No. 27, September Term, 2015. Opinion by Hotten, J.

**ATTORNEY DISCIPLINE — SANCTIONS — SUSPENSION:** Maryland attorney failed to maintain an attorney trust account, failed to competently represent client in federal lawsuit, failed to clearly communicate billing structure to client, made an agreement with a client for an unreasonable fee, failed to hold third-party funds in trust, failed to properly terminate representation, presented frivolous arguments in a federal lawsuit, was sanctioned by a federal court, and failed to properly maintain records of client's payments to attorney and third-parties. Attorney's misconduct violated Maryland Lawyers' Rules of Professional Conduct: 1.1, 1.4(b), 1.5(a), 1.15(a) and (c), 1.16(d), 3.1, 3.4(a) and (d), 8.4(a) and (d), Maryland Rules 16-604 (now Maryland Rule 19-404) and 16-606.1 (now Maryland Rule 19-407), and Maryland Code (Repl. Vol. 2010), § 10-306 of the Business Occupations & Professions Article. Under the circumstances, an indefinite suspension with the right to apply for reinstatement after 90 days is the appropriate sanction. As a condition of reinstatement, upon application, Respondent must provide the Attorney Grievance Commission and Bar Counsel with appropriate documentation showing the existence and maintenance of an attorney trust account.

Circuit Court for Montgomery County,
Maryland
Case No. 25749-M
Argued: September 8, 2016

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 27

September Term, 2015

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

ANDREW NDUBISI UCHEOMUMU

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,


JJ.

_____

Opinion by Hotten, J.

_____

Filed: December 15, 2016

On July 10, 2015, the Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Andrew Ndubisi Ucheomumu ("Respondent") charging him with violating the Maryland Lawyers' Rules of Professional Conduct ("MLRPC")[1], arising out of his representation of David C. Jackson and Jackson's companies, Jalin Realty Capital Advisors ("Jalin") and American Capital Holdings ("ACH"). Petitioner's gravest allegations against Respondent claimed that Respondent continued to assist Jackson after Respondent was placed on actual or constructive notice of Jackson's fraudulent lending practices.[2] The hearing judge agreed and found that Respondent was "well aware of Jackson's illegal activity," and that Respondent's representation "actively aided and abetted" Jackson and Jalin.

For the reasons outlined *infra*, we disagree with the hearing judge's finding that Respondent had knowledge of Jackson's advance fee fraud during Respondent's representation. Accordingly, we disagree with the hearing judge's finding that Respondent "aided and abetted" Jackson's criminal activity. In light of Respondent's less serious violations of the MLPRC discussed herein, we find that the appropriate sanction is an indefinite suspension with the right to apply for reinstatement after 90 days. As a condition

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and moved to Title 19, Chapter 300 of the Maryland Rules. This opinion refers to the MLRPC, not the MARPC, because all relevant conduct took place before July 1, 2016.

[2] On September 29, 2015, a jury in the United States District Court for the District of Connecticut found Jackson guilty of both conspiracy to commit wire fraud and substantive counts of wire fraud. *U.S. v. Jackson and Hurt*, No. 3:14-cr-00250-JBA (D. Conn. Sept. 29, 2015).

of reinstatement, upon application, Respondent must provide the Attorney Grievance Commission and Bar Counsel with appropriate documentation showing the existence and maintenance of an attorney trust account.

Petitioner charged Respondent with alleged violations of several rules of the MLRPC: Rule 1.1 (Competence); Rule 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer); Rule 1.4 (Communication); Rule 1.5 (Fees); Rule 1.15 (Safekeeping Property); Rule 1.16 (Declining or Terminating Representation); Rule 3.1 (Meritorious Claims and Contentions); Rule 3.4 (Fairness to Opposing Party and Counsel); Rule 8.4 (Misconduct); Petitioner also charged Respondent with violations of: Maryland Rule 16-604[3] (Trust account — Required deposits); Maryland Rule 16.606.1[4] (Attorney trust account record-keeping); and § 10-306 of the Business Occupations and Professions Article of the Maryland Code (Trust money restrictions).

## I.  Findings of Fact and Conclusions of Law

By an Order dated July 13, 2015, we referred the Petition to the Honorable Ronald B. Rubin of the Circuit Court for Montgomery County for an evidentiary hearing. On October 22, 2015, Judge Rubin ("the hearing judge" or "the hearing court") rendered Findings of Fact and Conclusions of Law. The findings were as follows:

> The [R]espondent, Andrew N. Ucheomumu ("Ucheomumu" or "[R]espondent"), is 56 years old. He immigrated to the United States from Nigeria in 1979. Before practicing law, he had been employed in the

---

[3] Maryland Rule 16-604 is now codified as Maryland Rule 19-404, effective as of July 1, 2016.

[4] Maryland Rule 16.606.1 is now codified as Maryland Rule 19-407, effective as of July 1, 2016.

import/export business from 1979 through 2006, Ucheomumu received his undergraduate degree in 2003 from the University of Pittsburgh. He received his law degree from the David A. Clarke School of Law of the University of the District of Columbia in 2008. Ucheomumu was admitted to the Maryland Bar on June 15, 2009.

In 2009, Ucheomumu received an LL.M. from The American University School of Law in constitutional and national security law. In 2011, he received an LL.M. from the University of Hull in England, in European Public Law.

After law school, Ucheomumu began practice as a solo practitioner. At the time of the events giving rise to the Petition, [R]espondent's professional experience was limited to serving as a panel attorney in Prince George's County, where he handled juvenile matters, a small number of family law, and simple contract cases.

Ucheomumu first met David C. Jackson ("Jackson") in 1993 at a "business incubator" located in Pittsburgh, Pennsylvania, where they both maintained offices. At that time, Jackson was operating a mortgage business and Ucheomumu was running an import/export business. In 2006, Jackson was convicted of mortgage fraud and sentenced to a forty-one month term in federal prison. This story was, according to [R]espondent, "front page news" in the local Pittsburgh newspaper. Respondent admitted that he knew, in 2006, that Jackson had been convicted of mortgage fraud. Ucheomumu moved to Maryland in June 2006.

Jackson was released from prison in 2009. In June 2010, Jackson contacted Ucheomumu by telephone. According to [R]espondent, Jackson simply "looked me up" out of the blue and said that he was "back in business on the mortgage lending side." During that conversation, Ucheomumu told Jackson that he had passed the Maryland Bar and was now engaged in the practice of law. Shortly thereafter, in July 2010, Ucheomumu was asked by Jackson to serve as "outside general counsel" for Jalin Realty Capital Advisers, LLC ("Jalin"), an entity controlled by Jackson.

### A.    Books and Records

On August 26, 2010, Jackson signed a retainer agreement on behalf of Jalin, which [R]espondent had prepared to memorialize the representation. Jalin allegedly was a hard money lender located in Ohio. The retainer agreement was signed by Jackson using the name of "C. David Manns." According to [R]espondent, Jackson told him that he had legally changed his

name to Manns after his release from federal prison. Respondent, however, never requested proof of or verified whether Jackson had legally changed his name.

As well, [Respondent] never visited Jalin's office or conducted any due diligence into Jalin's lending operation, despite knowing that Jackson previously had been convicted of mortgage fraud. Nevertheless, from July 2010 through December 2012, [R]espondent performed a variety of legal services for Jalin, a successor entity known as American Capital Holdings, L[L]C (also controlled by Jackson),[] and Jackson personally.

According to the retainer agreement, [R]espondent was hired as "Outside Counsel on General Matters."[] The first page of the agreement provides that there is to be a $10,000.00 non-refundable retainer. The retainer agreement said: "This means CLIENT will not get the money back."

Page two, however, recited inconsistently that legal work for Jalin was to be billed at an hourly rate of $195.00 per hour and charged against the retainer.

Page four recited that time is to be recorded in tenths of an hour and that the attorney "will bill monthly for legal services." Further, the retainer agreement provided that bills for legal services "are payable immediately when received."

During this period of representation, [R]espondent did not maintain an attorney trust account. Consistent with the language of the retainer agreement, [R]espondent deposited funds received from his client into his general bank account at the Bank of America.[] Respondent, who billed at $195.00 per hour according to the retainer agreement, sent only one invoice to Jackson on September 23, 2010.[] This invoice covered the period August 23, 2010 through September 22, 2010. No further invoices were created or sent to the client until after a complaint had been filed with Bar Counsel and an inquiry into [R]espondent's recordkeeping was initiated. Respondent did not maintain contemporaneous records of Jalin or Jackson's payments apart from his bank records and the single invoice.

On January 7, 2011, [R]espondent received a payment of $1,150.00 from American Capital Holdings, a company formed by Jackson. Respondent did not have a separate retainer agreement with American Capital Holdings. It is not entirely clear from the record whether this company is a legal successor to Jalin or a separate, new entity which Jackson formed to continue its lending business. Respondent performed no due

diligence in this regard and was unclear during his testimony at the hearing as to the precise nature of this entity and its ownership structure.[] Respondent was paid legal fees by American Capital Holdings[] and used some of the funds he received from American Capital Holdings to pay other attorneys. The court finds that [R]espondent paid one firm, the Pemberton Law Firm of Minnesota, the sum of $1934.00, not the $4,000.00 as originally instructed by Jackson.

Between August 2010 and December 2012, [R]espondent received a total of $90,850.00 in legal fees from Jackson and his businesses.[] During that same period, [R]espondent billed Jackson and his companies for $153,512.25.[] Some of the funds deposited into [R]espondent's bank account were earmarked for third parties, such as local counsel.[]

### B.    Knowledge of Jackson's Criminal Activities

According to FBI Agent Ronald Henderson, [R]espondent was told during a meeting on June 6, 2011, that Jackson was again under criminal investigation for mortgage fraud, and that Jackson used C. David Manns and Charles Jackson as aliases. Agent Henderson also presented [R]espondent with a financial analysis of the fraud under investigation and a summary of Jackson's past criminal history. The agent wanted to interview Jackson, but [R]espondent, on Jackson's behalf, requested transactional immunity from federal prosecution. The government was willing only to grant Jackson use immunity.[] As a consequence, on Jackson's behalf, [R]espondent declined the Agent's request for Jackson to cooperate in the federal investigation.

The court credits Agent Henderson's testimony and disbelieves [R]espondent's recollection of the meeting and its import. Clearly, as of June 6, 2011, [R]espondent knew that Jackson once again was under federal criminal investigation for fraud. The court finds that during his representation of Jalin, American Capital Holdings and Jackson, [R]espondent performed no due diligence regarding his clients' business practices, or the pleadings and discovery responses he filed on their behalf in various litigations, despite knowing that investors were claiming that Jalin was running an advance fee scheme[—]taking their advance fees but refusing to fund loans.

Once [R]espondent met with federal investigators in June 2011, the court finds that [R]espondent either knew, or recklessly disregarded, the fact that Jalin was taking advance fees from clients and then intentionally failing to fund loans. Despite this knowledge, [R]espondent thereafter actively aided and abetted Jalin (and Jackson) by intentionally obfuscating the truth about Jalin's business practices in communications with other attorneys who were

complaining about Jalin's refusal to return fees or to fund loans, and in filings with courts. Respondent's conduct in this regard was willful, and was not the result of a subjective, good faith mistake.

The court finds, based on a review of [R]espondent's time records along with [R]espondent's testimony at the hearing, that [R]espondent was intimately involved with Jalin's business practices and Jackson's personal matters, his protests to the contrary notwithstanding. Respondent was well aware, the court finds, that Jalin was taking advance fees from clients, declining thereafter to fund loans, and that Jalin's clients were regularly demanding refunds of the advance fees. Despite this knowledge, [R]espondent continued with the representation, including the filing of two federal lawsuits to aid and assist Jackson's criminal efforts. Also, [R]espondent, among other things, represented Jackson personally concerning the restitution Jackson owed for his prior mortgage fraud conviction, as well as legal research for Jackson's potential (and personal) tort claims. For [R]espondent to claim that he did not know what was going on – as he did during his testimony – belies credulity. The court disbelieves [R]espondent's testimony to the contrary.

As Judge Moylan observed in *Steinberg v. Arnold*, "as fact finder, [the judge] has the usual jury prerogatives of whether to believe or disbelieve witnesses, how much weight to give testimony and ultimately whether to be persuaded or not to be persuaded." 42 Md. App. 711, 712 (1979). The court is persuaded, by clear and convincing evidence, that [R]espondent knowingly assisted Jackson's illegal advance fee scheme and profited therefrom.

C. *Jalin v. A Better Wireless*

In July 2010, [R]espondent began representing Jalin in a dispute with Mitch Koep, the owner of A Better Wireless, NISP, LLC, a Minnesota company. A Better Wireless had sought funding through Jalin, paying an advance fee of $37,500.00. Jalin failed to provide funding and refused to refund the fee. On behalf of Jalin, the court finds that [R]espondent reviewed documents and provided advice with respect to this failed loan transaction. Thereafter, on January 21, 2011, [R]espondent filed a lawsuit on behalf of Jalin in federal court in Minnesota. The complaint pled a number of causes of action and sought money damages and injunctive relief. According to the complaint, A Better Wireless falsely accused Jalin of mishandling the loan. Respondent conducted no pertinent factual investigation before filing the complaint. Further, [R]espondent failed to procure a notarized affidavit that was needed to support the demand for injunctive relief. As well,

- 6 -

[R]espondent failed to appear for a pre-trial conference on June 8, 2011, and was sanctioned $450.00 by the court.

Thereafter, in August 2011, [R]espondent was served with discovery requests by counsel for A Better Wireless. On October 9, 2011, [R]espondent sent responses to the interrogatories and request for production of documents which wholly failed, the court finds, to comply with settled federal discovery rules. The responses, the court finds, contained frivolous and boilerplate objections, having nothing to do with the information requested by the opposing party. At the hearing in this matter, [R]espondent was not able to satisfactorily explain to this court why he answered the Minnesota discovery in the manner in which he did.

Not surprisingly, the federal magistrate judge supervising the Minnesota case also found [R]espondent's professional conduct sorely lacking. Among other things, the magistrate judge found that [R]espondent "made no attempt to explain why its discovery responses are substantially justified." The magistrate judge also found that the "discovery responses fail to meet an objective standard of reasonableness." The court sanctioned [R]espondent personally in the amount of $1,610.00. The court also precluded [R]espondent's clients from using in any subsequent proceedings in the case any documents or other information requested but not provided in the discovery responses drafted and filed by [R]espondent. The complaint [R]espondent filed for Jalin later was dismissed by the district judge, with prejudice.

## D.    The Texas Litigation

Jalin was dissolved in 2011, in connection with the bankruptcy filing by Anthony Byrd, a nephew of Jackson. Jalin, it turns out was simply a registered trade name of Rhythm Stone Media Group, LLC, not a separate company. Jackson established American Capital Holdings to continue his "lending" business.

On January 30, 2012, [R]espondent filed a complaint on behalf of American Capital Holdings in federal court in Texas. The suit was against an entity called Brightway Financial Group for allegedly issuing bogus standby letters of credit. In connection with this litigation, and in opposition to a motion to compel arbitration, [R]espondent knowingly filed an affidavit for Jackson using the false name ["]Charles Jackson," not David C. Jackson, which was his legal name.

- 7 -

## E.    Mitigation

By way of mitigation, [R]espondent presented the testimony of Samuel Hamilton, a well-known and senior member of the Bar. Mr. Hamilton has known [R]espondent since 2010. The court credits Mr. Hamilton's testimony regarding [R]espondent's character during the period and in the context which he has known him.

(Footnotes omitted).

The Conclusions of Law made by the hearing judge were as follows:

## Conclusions of Law

In view of the court's factual findings, the court concludes that [R]espondent has violated a number of the Rules of Professional Conduct. The court finds that [R]espondent knowingly failed to deposit client funds into an attorney trust account in violation of Rule 1.1. Respondent did not even have an attorney trust account until after his representation of Jalin and Jackson ended, in violation of Rule 16-604. As well, [R]espondent was required to deposit funds intended for Gilbert and Pemberton in trust, and not in his general bank account. Similarly, [R]espondent did not maintain contemporaneous records of his receipt of client funds until after Jackson filed a complaint and Bar Counsel requested [R]espondent to provide time and billing records, in violation of Rule 16-606.1. See also Section 10-306 of the Business Occupations and Professions Article, which prohibits the use of trust money for other than its intended purpose[].

With respect to the A Better Wireless litigation in Minnesota, the court finds that [R]espondent demonstrated a lack of competence in violation of Rule 1.1. The court further finds that [R]espondent failed, under Rule 1.4(a)(3) to comply with reasonable requests for information during discovery. The court also finds that [R]espondent violated Rule 1.4(b) by failing to disclose and clarify to his clients, in an unambiguous manner, the structure of the billing arrangement and the apportionment of fees to specific legal work. The court also finds that [R]espondent manifestly did not possess the requisite skill and experience to prosecute the Minnesota federal action, as evidenced by his testimony in this case, and the decision of two Minnesota federal judges.

Respondent also violated Rule 3.1 in connection with the Minnesota litigation. Among other things, the complaint [R]espondent filed had no good faith, factual basis and the [R]espondent had no documents to support the

allegations he made in the complaint. Further, the complaint was, at best, highly misleading and, the court finds, was part of a concerted effort to assist Jackson in holding onto illegally earned advance fees extracted in connection with a fraudulent lending scheme.

Respondent's conduct in discovery also violated Rule 3.4(a) and Rule 3.4(d). Respondent intentionally withheld substantive, discoverable information he learned from his meeting with the FBI and the complaints of other Jalin clients about its failure to fund loans. He also failed, in good faith, to meet and confer with opposing counsel. Further, in connection with the Minnesota case, the court finds that [R]espondent did not properly account to his clients (albeit they too were part of a criminal enterprise themselves) for the fees he charged, in violation of Rule 1.5(a).

The court finds that [R]espondent violated Rule 1.15(a) by failing to maintain funds belonging to third parties in an attorney trust account. Respondent also violated Rule 1.15(c) and (d) when he failed to obtain third parties' informed consent (the Pemberton Law Firm and Greg Gilbert, Esquire) before depositing unearned funds into his general bank account. The court also finds that [R]espondent violated Rule 1.16(d) by failing to send Jackson invoices and a complete copy of his file, after Jackson requested these documents on at least two occasions.

The court also finds multiple violations of Rule 8.4. Respondent plainly violated Rule 8.4(c) and (d) (and therefore also Rule 8.4(a)). Particularly egregious was his filing of two declarations by Jackson, using different names, with two federal courts. The court finds that [R]espondent knew that these were filed in an attempt to mislead and misinform the court and opposing counsel, and to conceal Jackson's true identity. Respondent, the court finds, intentionally used a false name on behalf of his client (Jackson) in two court filings, all of which aided and assisted his client's cover-up of an on-going fraud scheme, and enabled [R]espondent at the same time to bill and collect tens of thousands of dollars in fees. It defies common sense for [R]espondent to posit that he was unaware of Jackson's activities and that he was simply another person "duped" by Jackson. The court finds the opposite to be true; [R]espondent, well aware of Jackson's illegal activity, dined on the gravy train until that gravy simply got too hot to handle.

(Footnotes omitted).

## II.    Standard of Review

The manner in which this Court reviews attorney discipline proceedings is well established:

> This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland. We conduct an independent review of the record and we accept the hearing judge's findings of fact unless shown to be clearly erroneous. Under our independent review of the record, we must determine whether the findings of the hearing judge are based on clear and convincing evidence. With respect to exceptions, upon our review of the record, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. A hearing judge's factual finding is not clearly erroneous if there is any competent material evidence to support it. As to the hearing judge's conclusions of law, such as whether provisions of the Maryland Rules of Professional Conduct were violated, our consideration is *de novo*.

*Attorney Grievance v. Hodes,* 441 Md. 136–69, 168, 105 A.3d 533, 552–53 (2014) (citations, footnote, and quotations omitted). Petitioner filed no exceptions to the hearing judge's findings of fact and conclusions of law, and recommends disbarment. Respondent filed numerous exceptions to both the hearing judge's findings of fact and conclusions of law.

## III.    Respondent's Exceptions to the Findings of Fact

### Respondent's Exceptions to the Findings of Fact Pertaining to Respondent's Knowledge and Assistance of Jackson's Criminal Activity

Respondent presents several exceptions to the hearing judge's findings of fact regarding Respondent's knowledge of Jackson's criminal activity during Respondent's representation of Jackson and his companies. Underlying our analysis is the "fundamental principle that the factual findings of the assigned judge in an attorney disciplinary proceeding 'are *prima facie* correct and will not be disturbed on review unless

clearly erroneous.'" *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999) (quoting *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996)). A hearing judge's factual finding is not clearly erroneous "[i]f there is any competent material evidence to support [it]." *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411, 416 (2005).

Respondent opposes the hearing judge's findings of fact that, after Respondent conferred with Agent Henderson in June 2011, "[R]espondent either knew, or recklessly disregarded, the fact that Jalin was taking advance fees from clients and then intentionally failing to fund loans." Respondent argues that the jury verdict sheet utilized in Jackson's wire fraud trial supports Respondent's position. The guilty verdict adjudged Jackson's conduct during a time period which spanned from April 27, 2010 to August 3, 2010. Jackson did not initially contact Respondent regarding legal representation until July 16, 2010. Conversely, Petitioner contends that Respondent's billing records, Jackson's use of aliases, and Respondent's meeting with Agent Henderson provide competent material evidence that Respondent had knowledge of, or recklessly disregarded, Jalin's fraudulent activities.

Agent Henderson's testimony regarding the June 2011 meeting with Respondent provides evidence of the infancy of the investigation of Jackson at the time of Agent Henderson's meeting with Respondent. Agent Henderson testified at Respondent's evidentiary hearing as follows:

> So the purpose of our meeting, then, with [Respondent] was to talk to him about possibly getting his client, Mr. Jackson, to potentially cooperate. And during the course of that meeting, then we gave, we laid out some of the

evidence that we basically collected against his client. One of the, a couple of the things were that his client, we knew that his client's name was David Jackson, not C. David Manns, and that's the name that he [had] been using to, in communicating with several victims that we had spoken to.

We also communicated to [Respondent] about Mr. Jackson's past. We knew that he had a previous felony conviction. Had just gotten out of federal prison in 2009. And we knew the, told [Respondent] that we knew the extent of the fraud that [Jackson] had committed previously. And then we talked to [Respondent] about, basically told him that we had done some financial analysis, some bank record analysis, and had spoken to victims, and talked to them about statements that were made to, to them by Mr. Jackson.[5]

Before the hearing court, Agent Henderson testified that, at the time of his meeting with Respondent, Agent Henderson was not aware of the issuance of any warrant pertaining to Jackson's advance fee fraud. Agent Henderson further testified that he could not recall whether a target letter[6] had been issued regarding any ongoing investigation of Jackson's advance fee fraud.[7] The ultimate conviction against Jackson was based on conduct that

---

[5] Respondent sought transactional immunity for Jackson's cooperation in the investigation, which the Government was not willing to provide.

[6] A target letter is "a prosecutor's letter to a potential defendant stating that a criminal investigation is underway and suggesting that the recipient consult counsel." *Target Letter*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[7] Respondent's counsel's cross-examination of Agent Henderson contained the following exchange:

[Respondent's counsel]: . . . You're not aware of any application for a warrant that was made as of that time as to Mr. Jackson, is that correct?

[Agent Henderson]: Correct.

[Respondent's counsel]: You're not aware as to whether there was any target letter that was ever issued to Mr. Jackson as of that point, are you?

(continued…)

occurred during a time period that almost entirely preceded Respondent's representation of Jackson. The guilty verdict in Jackson's federal criminal conspiracy trial found Jackson guilty of conspiracy to commit wire fraud and substantive counts of wire fraud occurring on or about the following dates in 2010: April 27, May 10, May 21, June 23, June 24, July 1, July 14, July 30, and August 3.[8] Respondent's billing records show that he had billed Jackson for 2.1 hours of work on July 19, 2010 and 3.2 hours of work on July 21, 2010 for a total of 5.3 hours billed during the time period in which Jackson's convicted conduct occurred. Respondent's retainer agreement was not signed by Jackson until August 27, 2010. Based on the record, it is too grave of an inferential step to charge Respondent with sufficiently particularized knowledge of, or reckless disregard for, Jackson's criminal activity, as there is no competent material evidence to support that finding by clear and convincing evidence. Thus, Respondent's exception is sustained.

Respondent also excepts to the hearing judge's factual finding that Agent Henderson "presented [R]espondent with a financial analysis of the fraud under investigation . . . ." The testimony of Agent Henderson regarding this matter was as follows:

---

(…continued)

[Agent Henderson]: I don't recall if any—

[Respondent's counsel]: All right, that's all I'm interested in. Whether you recall.

[Agent Henderson]: —whether, whether there was a target letter at that point.

[8] Jury Verdict, *U.S. v. Jackson and Hurt*, No. 3:14-cr-00250-JBA (D. Conn. Sept. 29, 2015).

And then we talked to [Respondent] about, basically told him we had done some financial analysis, some bank record analysis, and had spoken to victims and, and talked to them about statements that were made to, to them by Mr. Jackson.

Petitioner did not file a written response to this exception.[9] "A hearing judge's factual finding is not clearly erroneous if there is any competent material evidence to support it." *Attorney Grievance Comm'n v. McDonald,* 437 Md. 1, 16, 85 A.3d 117, 125 (2014) (quotation omitted). Agent Henderson's testimony that he "told [Respondent] [the FBI] had done some financial analysis" does not lead to the inference that "Agent Henderson also presented [R]espondent with a financial analysis of the fraud under investigation . . . ." A presentation of financial analysis is substantially different from a communication that "some financial analysis[]" has been completed. Thus, Respondent's exception is sustained.

Respondent excepts to the hearing judge's finding that "Respondent was well aware . . . that Jalin was taking advance fees from clients, declining thereafter to fund loans, and that Jalin's clients were regularly demanding refunds of the advance fees. Despite this knowledge, [R]espondent continued with the representation, including the filing of two federal lawsuits to aid and assist Jackson's criminal efforts." For the reasons stated above, Respondent's exception to the hearing judge's finding regarding Respondent's knowledge of Jackson's criminal activity is sustained. It follows that, without knowledge of Jackson's

_____

[9] Petitioner however noted at oral argument before this Court that Agent Henderson's representation to Respondent that the FBI "had done some financial analysis, some bank record analysis," could be deemed as a presentation of financial analysis. We disagree with such a broad interpretation of Agent Henderson's testimony.

criminal activities, Respondent could not aid and abet Jackson's criminal activities. *See, e.g., Bellamy v. State*, 403 Md. 308, 334, 941 A.2d 1107, 1122 (2008) (holding that "a person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking by some act to make the crime succeed").

There is no competent material evidence to support a finding that Respondent's continued representation and lawsuits "aid[ed] and assist[ed] Jackson's criminal efforts." The first lawsuit, entitled *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, was brought in United States District Court for the District of Minnesota on January 21, 2011. 917 F.Supp. 2d 927 (D. Minn. 2013). This suit involved claims for cybersquatting,[10] trademark infringement, common law defamation and tortious interference. *Id*. All of Jalin's claims were dismissed by the court on summary judgment, and A Better Wireless' motion for summary judgment on its counterclaim for fraud was denied. *Id*. at 945. The suit was ultimately settled.

---

[10] As explained by the *A Better Wireless* court:

> Congress enacted the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), ('the ACPA') in 1999 to protect trademark owners against cybersquatting—the practice of registering well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own brand name.

*Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, 917 F.Supp. 2d 927, 935 (D. Minn. 2013) (citations and quotations omitted).

The second lawsuit, entitled *American Capital Holdings, LLC v. Brightway Financial Group, LLC*, was brought in the Northern District of Texas on January 30, 2012. This suit was based upon claims by Jackson that Alex Hurt, and others associated with Brightway, had defrauded Jackson's company, ACH, and its customers by issuing fraudulent guaranty letters of credit from a dummy company known as RBS Alliance. The lawsuit was ultimately dismissed based upon a decision upholding a mandatory arbitration clause in the parties' contract. There is no competent material evidence of record to support a finding that Respondent's representation and filing of these two lawsuits "aid[ed] and assist[ed] Jackson's criminal efforts."

Next, Respondent excepts to the hearing judge's finding of fact that Respondent "knowingly assisted Jackson's illegal advance fee scheme and profited therefrom." For the reasons expressed above, there is no competent material evidence of record to support a finding by clear and convincing evidence that Respondent had knowledge of, let alone assisted in, Jackson's criminal activities. Thus, this exception is sustained.

**Respondent's Exceptions to the Hearing Judge's Remaining Findings of Fact**

Respondent demurs to the finding of fact that "[R]espondent paid one firm, the Pemberton Law Firm of Minnesota, the sum of $1[,]934.00, not the $4,000.00 as originally instructed by Jackson." Respondent testified before the hearing court that he sent to Jackson the Pemberton Law Firm's bill of $1,934 to be paid by Jackson directly to the Pemberton Law Firm. Respondent averred that he sent this bill to Jackson because Jackson habitually paid Respondent for his work, while also giving Respondent payments that were to be forwarded to Pemberton. Respondent further testified that Jackson wired $4,000 and

- 16 -

then $2,000 into the Respondent's operating account. Respondent testified that, at the time these funds were wired, Jackson owed Respondent the sum of $52,333 for legal work performed.

An email from Respondent to Jackson, with the subject line "Re: Money Transfer from AMERICAN CAPITAL HOLDINGS, LLC []" stated as follows: "This is to certify that we received a total of $6,000.00 representing the following: A) $4,000.00 for Pemberton Law Firm in Minnesota. B) $2,000 for The Ucheomumu Group, LLC to offset the cost of traveling and lodging in Minnesota for the upcoming hearing scheduled for September 19, 2012. Thank you." Respondent testified before the hearing court that, immediately after Respondent sent this email, Jackson sent Respondent a considerable amount of documents to review. Respondent then asked Jackson how Jackson would pay Respondent for this document review, as Jackson already had an outstanding balance due to Respondent. Respondent testified that Jackson then instructed Respondent to only pay the Pemberton Law Firm their outstanding balance of $1,934 from the wired funds, instead of $4,000 as Jackson originally instructed.

Despite Respondent's testimony regarding Jackson's second instruction to only pay $1,934 of the wired funds to Pemberton, the evidence of this second instruction does not render null and void the competent material evidence to support the finding of fact that "[R]espondent paid one firm, the Pemberton Law Firm of Minnesota, the sum of $1934.00,

not the $4,000.00 *as originally instructed* by Jackson." (Emphasis added). Thus, Respondent's exception is overruled. [11]

Respondent next excepts to the hearing judge's finding that "[i]n July 2010, [R]espondent began representing Jalin in dispute with Mitch Koep, the owner of A Better Wireless, NISP, LLC, a Minnesota company." The evidence of record demonstrates that Respondent's representation in the *A Better Wireless* suit began in October 2010, not July 2010. Thus, this exception is sustained.

Lastly, Respondent excepts to the hearing judge's finding that "Respondent failed to procure a notarized affidavit that was needed to support the demand for injunctive relief." While this is ultimately supported by competent material evidence of record, we also note that the record reflects that Respondent made attempts to procure the affidavit from his client, Jackson. Jackson, through no fault of Respondent, failed to provide the requisite information needed for the affidavit to Respondent.

## IV. Respondent's Exceptions to the Conclusions of Law

Respondent filed exceptions to the hearing judge's conclusions of law. We review the hearing judge's conclusions of law *de novo*, addressing each of Respondent's exceptions.

---

[11] Notwithstanding Respondent's testimony regarding Jackson's amendment of Jackson's original instruction, as noted in Petitioner's Response to Respondent's Exceptions "[o]f course, it is undisputed that the funds earmarked for Pemberton were never maintained in trust." Respondent's violations of rules and statutes governing trust accounts are outlined *infra*.

**Respondent's Exceptions to the Conclusions of Law Pertaining to Respondent's Knowledge and Assistance of Jackson's Criminal Activity**

Respondent excepts to the following conclusions of law made by the hearing judge pertaining to Respondent's knowledge and assistance of Jackson's criminal activity:

> Further, the complaint [in the *A Better Wireless* suit] . . . was part of a concerted effort to assist Jackson in holding on to illegally earned advance fees extracted in connection with a fraudulent lending scheme.
>
> ***
>
> Respondent . . . intentionally used a false name on behalf of his client (Jackson) in two court filings, all of which aided and assisted his client's cover-up of an on-going fraud scheme[.]

For the reasons outlined in Section III, we sustain Respondent's exceptions pertaining to the hearing judge's conclusions of law based on findings of fact that Respondent had knowledge of, or recklessly disregarded, Jackson's criminal activity, and acted in furtherance thereof.

**Respondent's Exceptions to the Hearing Judge's Remaining Conclusions of Law**

*Respondent's Exception to Rule 1.1 as it Pertains to Trust Accounts*

Rule 1.1 provides, "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Respondent excepts to the hearing judge's conclusion of law that Respondent "knowingly failed to deposit client funds into an attorney trust account in violation of Rule 1.1" During all times pertinent to Respondent's representation of Jackson and Jalin, Respondent did not maintain an attorney trust account. Thus, Respondent's exception is overruled. As we held in *Attorney*

*Grievance Comm'n v. Shephard*, competent representation includes proper treatment and maintenance of client funds in a trust account. 444 Md. 299, 324–25, 119 A.3d 765, 780 (2015). We find by clear and convincing evidence that Respondent violated Rule 1.1 by failing to maintain an attorney trust account during his representation of Jackson, Jalin, and ACH.

### *Respondent's Exception Regarding Rule 1.15*

Respondent next excepts to the hearing judge's conclusion of law that Respondent "was required to deposit funds intended for Gilbert and Pemberton in trust, and not into his general bank account." Rule 1.15(a) and (c) provide:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.
>
> * * *
>
> (c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

Respondent argues that he did not personally deposit any funds intended for third parties into his bank account. Rather, Jackson wired the funds into Respondent's account. We hold that violations of Rule 1.15(a) and (c) do not require intention, and in this case, Respondent did not maintain a trust account in which funds could be deposited. Thus, Respondent's

exception is overruled. Accordingly, we find that Respondent violated Rule 1.15(a) and (c).

The hearing judge further found that Respondent violated Rule 1.15(d). Rule 1.15(d) provides:

> (d) Upon receiving funds or other property in which a client or third party has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

Respondent testified before the hearing court that Respondent sent to Jackson the Pemberton Law Firm's bill of $1,934 to be paid by Jackson directly to the Pemberton Law Firm. Respondent further testified that, on September 13, 2012, Jackson wired $4,000 and then $2,000 into the Respondent's operating account. Respondent testified that, at the time these funds were wired, Jackson owed Respondent the sum of $52,333 for legal work performed.

An email from Respondent to Jackson confirmed the wire transfer of $6,000, and further confirmed that $4,000 of the wired funds were intended for Pemberton. Respondent testified before the hearing court that, immediately after Respondent sent this email, Jackson sent Respondent a considerable amount of documents to review. Respondent then asked Jackson how he would pay Respondent for this document review, as Jackson already had an outstanding balance due to Respondent. Respondent testified that Jackson then instructed Respondent to only pay the Pemberton Law Firm their outstanding balance of $1,934 of the wired funds, instead of $4,000 as Jackson originally instructed. The evidence

shows that Pemberton ultimately received $1,934 pursuant to Jackson's amended instruction. We cannot find by clear and convincing evidence that Respondent failed to promptly notify Pemberton of the funds Pemberton was entitled to receive pursuant to Jackson's amended instruction. In addition, Respondent did not fail to promptly deliver the funds to Pemberton pursuant to Jackson's amended instruction. Thus, Respondent did not violate 1.15(d).

### *Respondent's Exception Regarding Rule 1.4(b)*

Respondent further demurs from the hearing judge's finding that Respondent "violated Rule 1.4(b) by failing to disclose and clarify to his clients, in an unambiguous manner, the structure of the billing arrangement and the apportionment of fees to specific legal work." Rule 1.4(b) states that, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Respondent's retainer agreement, signed by Jackson, stated in a section entitled "FEES BEYOND RETAINER[,]" "CLIENT has read and understands that this Agreement calls for any and all fees to be figured on an hourly basis . . . ." Respondent's emails to Jackson claimed that, with respect to the *A Better Wireless* matter, Respondent charged Jackson flat fees: $7,000 to file a temporary restraining order and $12,000 for subsequent litigation. In addition, Respondent's billing records show that Respondent charged hourly fees for the *A Better Wireless* matter. We find that Respondent's failure to clearly communicate his billing structure to Jackson in an unambiguous manner is a violation of Rule 1.4(b). *Attorney Grievance Comm'n v. Ross*, 428 Md. 50, 74, 50 A.3d 1166, 1179–80 (2012).

### *Respondent's Exception Regarding Rule 3.4*

Respondent next excepts to the hearing judge's finding that "[R]espondent intentionally withheld substantive, discoverable information he learned from his meeting with the FBI and the complaints of other Jalin clients about its failure to fund loans."[12] The hearing judge found that Respondent violated Rule 3.4(a) and (d). Rule 3.4(a) states that "[a] lawyer shall not . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value." Rule 3.4(d) states that "[a] lawyer shall not . . . in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party[.]" Judge Brisbois' Order, which sanctioned the Respondent for Respondent's conduct during discovery in the *A Better Wireless* matter, stated:

> Moreover, combined with Plaintiff's late responses to discovery, late submission of verification of discovery responses by a corporate representative, and failure to even appear at the present motion hearing, suggests that Plaintiff's discovery requests were formulated for an improper purpose and intended to delay and harass the Defendant.[13]

---

[12] We do not agree that Respondent's failure to provide information related to his meeting with Agent Henderson regarding the preliminary investigation into his client's conduct, constitutes a violation of the Rules of Professional Conduct. Respondent's other conduct, however, in the *A Better Wireless* litigation constitutes a violation of Rule 3.4.

[13] *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC v. Rhythm Stone Media Group, LLC*, No. 0:11-cv-00165-JRT-LIB (D. Minn. Feb. 22, 2012).

Respondent's conduct during discovery in the *A Better Wireless* litigation, as evidenced by Judge Brisbois' Order, violated Rule 3.4(a) and (d). Thus, Respondent's exception is overruled.

### *Respondent's Exception Regarding Rule 1.5(a)*

Lastly, Respondent excepts to the hearing judge's conclusion that Respondent "did not properly account to his clients (albeit they too were part of a criminal enterprise themselves) for the fees he charged, in violation of Rule 1.5(a)." Rule 1.5(a) provides:

> A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The facts to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

Respondent claimed that, "[a]fter our initial invoice [was] not paid in full, we agreed with [Jackson] that he must pay us on a flat fee basis for our work. Thus, we did not have an

- 24 -

invoice relationship with [Jackson], thereafter." As noted in our analysis of Respondent's violation of Rule 1.4(b), a flat fee arrangement was not discussed within the retainer agreement. The agreement stated in a section entitled "FEES BEYOND RETAINER," "CLIENT has read and understands that this Agreement calls for any and all fees to be figured on an hourly basis . . . ." Respondent charged flat fees for work that was also billed on an hourly basis. We find that the ambiguous and contradictory nature of billing structure, which was not clearly communicated to the client, constitutes an unreasonable fee agreement in violation of Rule 1.5(a). Thus, Respondent's exception is overruled.

### The Hearing Judge's Remaining Conclusions of Law

### *Maryland Rule 16-604*

The hearing judge further found that Respondent violated Maryland Rule 16-604,[14] as Respondent did not have a trust account during the relevant time period. We agree. Maryland Rule 16-604 provides:

> Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

---

[14] Maryland Rule 16-604 is now codified as Maryland Rule 19-404, effective as of July 1, 2016. We refer to the former rule, as the hearing judge's conclusions of law were made prior to this change and referred to the former rule.

Maryland Rule 16-604 requires that all funds received by a lawyer from a client or third person, and designated to be delivered to a client or third person, be deposited in a trust account. Respondent did not have an attorney trust account until after his representation of Jalin concluded. Therefore, any deposit of a third party fee was a *de facto* commingling of fees with Respondent's personal funds. Respondent received several payments from Jackson intended for third parties, none of which were transferred to a trust account. Therefore, Respondent's actions violated Rule 16-604.

### *Maryland Rule 16-606.1*

The hearing judge found that the Respondent violated Rule 16-606.1[15] as Respondent did not maintain contemporaneous records of his receipt of client funds until after Jackson filed a complaint and Bar Counsel requested Respondent to provide time and billing records. We agree. Maryland Rule 16-606.1[16] proscribes that for each attorney trust

---

[15] Maryland Rule 16.606.1 is now codified as Maryland Rule 19-407, effective as of July 1, 2016. We refer to the former rule, as the hearing judge's conclusions of law were made prior to this change and referred to the former rule.

[16] Maryland Rule 16-606.1 provides:

> **(a) Creation of records.** The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

> (1) Attorney trust account identification. An identification of all attorney trust accounts maintained, including the name of the financial institution, account number, account name, date the account was opened, date the account was closed, and an agreement with the financial institution establishing each account and its interest-bearing nature.

> (continued…)

(2) Deposits and disbursements. A record for each account that chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of the disbursement, (ii) the amount, (iii) the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) Client matter records. A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) Record of funds of the attorney. A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 16-607 b.

**(b) Monthly reconciliation.** An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as

(continued…)

account, a chronological record must be kept detailing transactions made from or to such account. Respondent did not maintain contemporaneous records of client funds to be maintained in trust. Thus, Respondent violated Rule 16-606.1.

### *Maryland Code (Repl. Vol. 2010), § 10-306*<br>*of the Business Occupations & Professions Article*

Section 10-306 provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." Respondent received attorney's fees intended for third parties into his operating account. Respondent did not at any point transfer these funds into a trust account, as Respondent did not have a trust account until after his representation of Jalin and Jackson ended. Thus, Respondent violated § 10-306.

---

(…continued)

permitted by Rule 16-607 b, and the adjusted month-end financial institution statement balance. The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

(c) **Electronic records.** Whenever the records required by this Rule are created or maintained using electronic means, there must be an ability to print a paper copy of the records upon a reasonable request to do so.

(d) **Records to be maintained.** Financial institution month-end statements, any canceled checks or copies of canceled checks provided with a financial institution month-end statement, duplicate deposit slips or deposit receipts generated by the financial institution, and records created in accordance with section (a) of this Rule shall be maintained for a period of at least five years after the date the record was created.

## *Rule 1.1*

The hearing judge found that "[w]ith respect to the A Better Wireless litigation in Minnesota, the court finds that [R]espondent demonstrated a lack of competence in violation of Rule 1.1." In the A Better Wireless litigation, Respondent was sanctioned for discovery violations.[17] In addition, in the Order granting summary judgment to A Better Wireless on all of Jalin's claims, the judge stated that Respondent's claims on behalf of Jalin were "variously unsupported, insufficiently pled, and entirely without merit." *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, 917 F.Supp. 2d 927, 931 (D. Minn. 2013). The court continued, "[t]he factual record before the Court is quite sparse, due in large part to the conduct of Jalin's counsel during discovery." *Id*. These facts, when taken together, provide clear and convincing evidence of Respondent's violation of Rule 1.1 in the *A Better Wireless* litigation.

## *Rule 1.4(a)(3)*

The hearing judge found that Respondent "failed, under Rule 1.4(a)(3) to comply with reasonable requests for information during discovery." Rule 1.4(a)(3) provides: "[a] lawyer shall . . . promptly comply with reasonable requests for information[.]" We have held that Rule 1.4(a)(3), "deals with an attorney's communications with his or her client and not his or her communication or lack of communication with the court." *Attorney Grievance Comm'n v. Patton*, 432 Md. 359, 377, 69 A.3d 11, 22 (2013). We cannot find

---

[17] *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC v. Rhythm Stone Media Group, LLC*, No. 0:11-cv-00165-JRT-LIB (D. Minn. Feb. 22, 2012).

by clear and convincing evidence that Respondent's conduct in discovery in this matter stems from Respondent's failure to communicate with Jackson. Thus, Respondent's conduct during discovery did not violate Rule 1.4(a)(3).

### *Rule 1.16(d)*

Rule 1.16(d) requires that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled . . . ." Respondent violated Rule 1.16(d) by failing to send Jackson invoices and a complete copy of his file after Jackson requested them on two occasions in January 2011 and February 2013.

### *Rule 3.1*

Rule 3.1 states that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes, for example, a good faith argument for an extension, modification or reversal of existing law." In *Attorney Grievance Comm'n v. Culver*, we concluded that "Respondent's conduct went well beyond the realm of zealous advocacy" when the hearing judge concluded that:

> Respondent engaged in a pattern of conduct of obstruction and delay to interfere in [the client]'s suit against him. He filed suit against [the client], alleging defamation, then failed to file written answers to discovery and evaded attempts to be deposed. Respondent eventually voluntarily dismissed that suit. After [the client] filed suit against Respondent, [Respondent] filed a bankruptcy petition on the eve of the damages hearing in order to stay the hearing.

381 Md. 241, 279, 263, 849 A.2d 423, 446, 436 (2004). The bankruptcy judge in *Culver* concluded that "[t]his case is little more than a smoke screen. Whether it was filed in good faith or not is debatable." *Id*. at 280, 849 A.2d at 447. In the Order granting summary judgment to A Better Wireless on all of Jalin's claims, Chief United States District Court Judge Tunheim stated that Respondent's claims on behalf of Jalin were "variously unsupported, insufficiently pled, and entirely without merit." *Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, 917 F.Supp. 2d 927, 931 (D. Minn. 2013). Chief Judge Tunheim further noted in his Order:

> Jalin did not file an answer to ABW's counterclaims. After the Magistrate Judge granted Jalin's three requests to extend the deadline[], Jalin moved to dismiss ABW's counterclaims on a number of grounds that were each rejected by this Court. *See Jalin Realty Capital Advisors*, 2012 WL 838439, at *3 ("Jalin's theories of dismissal are variously opaque and patently without merit."). The Court also warned Jalin's counsel that one of its arguments violated Fed. R. Civ. P. 11(b)(2) because it lacked factual support. *See id*. at *4 ("Rooting a motion to dismiss for lack of personal jurisdiction in facts that counsel conceded at oral argument to be false—namely that Rhythm and Jalin are distinct corporate entities—is not acceptable under Rule 11.").

*Id*. at 933, n. 3 (citations omitted). The court continued, "[t]he factual record before the Court is quite sparse, due in large part to the conduct of Jalin's counsel during discovery." *Id*.

Although Jalin initially asserted that, upon information and belief, A Better Wireless never sent any loan application fee directly to Jalin, in its declaration, Jalin acknowledged that it received $37,500 from Ride Ocean Zoom on behalf of A Better Wireless. Judge Tunheim found that Respondent's complaint "appears highly misleading for failing to reference Ride Ocean Zoom's role in the transaction." We agree with the hearing judge's

- 31 -

conclusion of law that Respondent's conduct in the *A Better Wireless* litigation constitutes a violation of Rule 3.1.

## *Rule 8.4*

The hearing judge found multiple violations of Rule 8.4. Rule 8.4 provides, in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice
. . . .

For the reasons outlined in Section III, we do not agree with the hearing judge regarding Respondent's knowledge and assistance of Jackson's criminal activity. Further, we do not find by clear and convincing evidence that Respondent engaged in any conduct amounting "dishonesty, fraud, deceit or misrepresentation." Thus, Respondent did not violate Rule 8.4(c).

This Court finds, however, that the record demonstrates by clear and convincing evidence that the Respondent violated Rule 8.4(d). We have stated that "[i]n general, an attorney violates [Rule 8.4(d)] when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v.*

*Rand,* 411 Md. 83, 96, 981 A.2d 1234, 1242 (2009) (citations omitted). Respondent's

conduct in the *A Better Wireless* litigation constitutes a violation of Rule 8.4(d). Thus, it

follows that Respondent violated Rule 8.4(a).

## V. Sanction

We shall hold that the appropriate sanction in this case is an indefinite suspension

with the right to apply for reinstatement after 90 days. In addition, upon application for

reinstatement, Respondent must provide the Attorney Grievance Commission and Bar

Counsel with appropriate documentation showing the existence and maintenance of an

attorney trust account. We recognize the appropriate sanction for violations of the Rules of

Professional Conduct generally "depends on the facts and circumstances of each case,

including consideration of any mitigating factors." *Attorney Grievance Comm'n v.*

*Zuckerman,* 386 Md. 341, 375, 872 A.2d 693, 713 (2005) (citations omitted). The purposes

of attorney discipline are as follows: "'to protect the public, to deter other lawyers from

engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the

integrity of the legal profession.'" *Id*. (quoting *Attorney Grievance Comm'n v. Awuah,* 374

Md. 505, 526, 823 A.2d 651, 663 (2003)). In *Attorney Grievance Comm'n v.*

*Sheridan,* 357 Md. 1, 741 A.2d 1143 (1999), we said:

> Because 'an attorney's character *must remain beyond reproach*' this Court
> has the duty, since attorneys are its officers, to insist upon the *maintenance* of
> the integrity of the bar and to prevent the transgressions of an individual
> lawyer from bringing its image into disrepute. Disciplinary proceedings have
> been established for this purpose, not for punishment, but rather as a catharsis
> for the profession and a prophylactic for the public.

*Id.* at 27, 741 A.2d. at 1157 (quoting *Attorney Grievance Comm'n v. Deutsch,* 294 Md. 353, 368–69, 450 A.2d 1265, 1273 (1982)).

When imposing sanctions, we have enunciated that, "'[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations *and the intent with which they were committed.*'" *Attorney Grievance Comm'n v. Gore,* 380 Md. 455, 472, 845 A.2d 1204, 1213 (2004) (emphasis added). As in every case, we consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances. *Attorney Grievance Comm'n v. Sweitzer,* 395 Md. 586, 598–99, 911 A.2d 440, 447–48 (2006). We also look to our past cases involving attorney discipline when imposing sanctions. *Attorney Grievance Comm'n v. Thompson,* 376 Md. 500, 520, 830 A.2d 474, 486 (2003). Under the ABA standards, mitigating factors include:

> Absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 721, 955 A.2d 755, 769 (2008) (quoting *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996)).

We note that mitigating circumstances exist in the case at bar. Respondent testified before the hearing court that he erroneously relied on local counsel's assurances that local counsel would appear on his client's behalf at the scheduling conference and motions

hearing in the *A Better Wireless* matter. Respondent expressed remorse to the hearing court and acknowledged that he was ultimately responsible, as lead counsel, for failing to appear at both proceedings. Respondent paid the U.S. District Court's imposed sanction of $1,610 to opposing counsel in that matter.

Respondent was a newly admitted attorney at the time of his representation of Jackson and Jackson's companies. Respondent was admitted the Bar in June of 2009. His representation of Jackson and his companies spanned from 2010 to 2012. Respondent admitted to the hearing court that he was engaged in matters that were "over [his] head" in relation to his representation of Jackson and Jackson's companies. Although Respondent had a prior career in the import/export business, and he was fifty-six years old at the time of the hearing in this matter, Respondent was, nonetheless, inexperienced in the unique challenges that confront solo practitioners, and those in private practice, generally, during his representation of Jackson and Jackson's companies. Lastly, Mr. Samuel Hamilton, Esq., a longtime member of the Maryland Bar, testified favorably before the hearing judge regarding Respondent's quality of character since Mr. Hamilton initially met Respondent in 2010. The hearing judge expressly credited Mr. Hamilton's testimony regarding Respondent's character.

This Court's jurisprudence demonstrates that the appropriate sanction in the case at bar is an indefinite suspension with the right to apply for reinstatement after 90 days.[18] For

_____

[18] As a condition of reinstatement, upon application, Respondent must provide the Attorney Grievance Commission and Bar Counsel with appropriate documentation showing the existence and maintenance of an attorney trust account.

example, in *Attorney Grievance Comm'n v. Stillwell,* we suspended indefinitely an attorney, with the right to apply for reinstatement in no sooner than 60 days, for lack of diligence in pursuing a client's matter, failing to keep the client reasonably informed about the status of the representation, and failing to deposit an unearned retainer in a client trust account, constituting violations of MLRPC 1.3, 1.4, and 1.15 respectively. 434 Md. 248, 274, 74 A.3d 728, 743 (2013). In determining the appropriate sanction, we noted as a mitigating circumstance that the attorney fully cooperated with Bar Counsel and provided all information that was required to assist in his investigation. *Id*. at 273, 74 A.3d at 732.

By contrast, in *Attorney Grievance Comm'n of Maryland v. Patterson*, 421 Md. 708, 28 A.3d 1196 (2011), we indefinitely suspended an attorney, with the right to reapply for readmission no sooner than six months, for violations of Rules of Professional Conduct involving trust accounts, failure to exercise diligence, and failure to communicate with a client. *See Id*. at 743, 28 A.3d at 1216–17. The attorney in *Patterson*, committed each of these violations multiple times with multiple clients. *Id*. Furthermore, in *Patterson*, the attorney was found to have violated Rule 8.1 for failing to cooperate with Bar Counsel with respect to two client complaints. *See id*. at 738–39, 28 A.3d at 1214. Unlike in *Patterson*, Respondent in the case at bar did not commit a Rule 8.1 violation.

In other cases, where the offending attorney has mishandled client funds, but not as a result of dishonest conduct, we have suspended the offending attorney indefinitely with the right to apply for readmission after a period of time. For example, in *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 872 A.2d 693 (2005), the offending attorney violated several rules of the MLRPC, including MLRPC 1.15, due to employee

theft and ineffectual accounting procedures. Id. at 369, 872 A.2d 693, 710. We suspended the attorney in that case indefinitely with the right to apply for readmission after 30 days, noting *inter alia* the lack of intentionally dishonest conduct on the part of the offending attorney. *Id*. at 386, 872 A.2d at 720. In *Attorney Grievance Comm'n v. Sperling*, 380 Md. 180, 844 A.2d 397 (2004), the attorney was found to have violated, among other Rules, MLRPC 1.15, had been previously sanctioned, and was found to have operated a relatively large negative balance to his client trust account (approximately $40,000), but was not accused of dishonest conduct in relation to his handling of client funds. *Id*. at 193, 844 A.2d at 405. In that case, we suspended Sperling indefinitely, with the right to apply for readmission after 90 days. *Id*.

Respondent engaged in serious, wide-ranging misconduct, and violated numerous MLRPC, two Maryland Rules, and one provision of the Code of Maryland. Specifically, Respondent did not maintain an attorney trust account for over two years. He formed his law practice and plainly ignored his responsibility to set up a trust account to hold separately unearned client funds and funds for third parties. During that time, Respondent maintained client funds and funds for third parties in his general bank account with Bank of America.[19]

Further, Respondent engaged in behavior which prompted the U.S. District Court for the District of Minnesota to personally sanction Respondent for his conduct during

---

[19] For these reasons, we require that, upon reapplication for admission, Respondent must provide appropriate documentation showing the existence and maintenance of an attorney trust account.

discovery. Magistrate Judge Brisbois found that Respondent's conduct necessitated more than just monetary sanctions, and further precluded Respondent's clients—in any subsequent proceedings in the case—from using any documents or other information that was requested but not provided in the discovery responses. Within the scope of that same litigation, Chief Judge Tunheim stated that Respondent's conduct was unacceptable under Rule 11 of the Federal Rules of Civil Procedure.

Considering the spectrum and degree of Respondent's misconduct, in light of the mitigating circumstances, we indefinitely suspend Respondent from the practice of law in Maryland with the right to apply for reinstatement after 90 days. As a condition of reinstatement, upon application, Respondent must provide the Attorney Grievance Commission and Bar Counsel with appropriate documentation showing the existence and maintenance of an attorney trust account.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ANDREW NDUBISI UCHEOMUMU.**